UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEIGH PETERSON and NORTHERN
CAPITAL INSURANCE AGENCY
SERVICES, LLC,

      Plaintiffs,

                                 Case No. 2:20-cv-11016
v.                             Honorable Linda V. Parker

NORTHERN CAPITAL, INC., WAYNE
MANN, and CHOICE INSURANCE
SERVICES, LLC, d/b/a Northern Capital
Insurance Group,

      Defendants.

_____/

**<u>OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT WAYNE MANN'S AND CHOICE INSURANCE SERVICES,
LLC'S MOTION TO DISMISS (ECF NO. 3)</u>**

Plaintiff Northern Capital Insurance Agency Services, LLC ("NCIAS"), a

licensed insurance agency, and Plaintiff Leigh Peterson, President of NCIAS, each

allegedly subcontracted at one point or another with Defendants Northern Capital,

Inc. ("Northern Capital"), Choice Insurance Services, LLC ("Choice Insurance"),

and/or Wayne Mann, President of Northern Capital and employee of Choice

Insurance.  (ECF No. 1-1 at Pg. ID 14.)  In response to events that occurred over

the course of the parties' dealings, Plaintiffs now sue Defendants for (i) breach of

contract as to Northern Capital; (ii) fraudulent misrepresentation as to Northern

Capital and Mann; (iii) innocent misrepresentation as to Northern Capital and Mann; (iv) statutory conversion as to Northern Capital and Choice Insurance; (v) accounting as to Northern Capital and Choice Insurance; (vi) breach of contract as to Choice Insurance; (vii) tortious interference with a contract or business relations as to all Defendants; (viii) receivership as to Northern Capital and Choice Insurance; and (ix) silent fraud as to Mann.  (ECF No. 1-1.)

The matter is presently before the Court on Choice Insurance's and Mann's Motion to Dismiss.  (ECF No. 3.)  The motion has been fully briefed.  (ECF Nos. 14, 16.)  For the reasons that follow, the motion is granted in part and denied in part.[1]

## FACTUAL BACKGROUND

### NCIAS & Northern Capital Enter into An Agency-Agent Agreement

On June 1, 2008, NCIAS and Northern Capital entered into an Agency-Agent Agreement ("Agency Agreement").  (ECF Nos. 1-1 at Pg. ID 15, 34-38.)  Under the agreement, NCIAS had the authority to solicit and bind insurance business for any of Northern Capital's insurance companies.  (*Id.* at Pg. ID 15, 34.)

---

[1] Northern Capital has not moved for dismissal of the Complaint against it, nor has it filed an Answer or made an appearance in this case.  Accordingly, this Opinion and Order does not address Count I (Breach of Contract as to Northern Capital) and does not otherwise opine as to Northern Capital's potential legal liabilities.

2

In addition to the Agency Agreement, the parties entered into an "Addendum to Agent's Agreement" ("Addendum").  (*Id*. at Pg. ID 40.)  Together, the Agency Agreement and Addendum outlined several provisions related to ownership of business accounts, expenses, and compensation:

- "<u>OWNERSHIP OF BUSINESS</u>":  "Business accounts will be . . . developed, solicited, serviced, sold and maintained by . . . [NCIAS] and [NCIAS]'s employees and these accounts are the property of [] [NCIAS] 100%. . . .  In the event of termination of this Agreement, [] [NCIAS]'s records, use and control of expirations shall remain the property of [] [NCIAS] and be left in [the] undisputed possession [of] [NCIAS]."  (*Id*. at Pg. ID 36, ¶ J.)

- "<u>EXPENSES</u>": Northern Capital will pay NCIAS's expenses, including (i) NCIAS employees' "out of the home office payroll and payroll services"; (ii) NCIAS employees' workers compensation; (iii) "all business expenses arising out [] [NCIAS]'s business activities"; and (iv) "the errors and omissions insurance on behalf of [] [NCIAS]'s business affiliated with [] [Northern Capital] . . . .  Expenses will be paid from gross revenues generated by [] [NCIAS]'s business", "credit[ing] 90% of gross commission to [] [NCIAS]."  (*Id*. at Pg. ID 35, ¶ F.)

- "<u>FULL COMPENSATION</u>": Northern Capital will "full[y] compensate" NCIAS as follows:

    o Northern Capital will remit to NCIAS "ninety percent (90%) of the gross commissions actually received by [] [Northern Capital]" on "all property and casualty business produced by [NCIAS] and/or [NCIAS]'s employees. . . . This applies to all new and renewal business."  (*Id*. at Pg. ID 40, ¶ 1(a).)

3

o "[NCIAS] will receive any contingency, bonus, or profit-sharing commissions on a pro rata basis from all insurance markets associated with [] [Northern Capital] . . . . [NCIAS] will receive a copy of all contingency, bonus, or profit sharing arrangements that [Northern Capital] has established or establishes while [the] agreement is in force." (*Id.* at Pg. ID 40, ¶ 1(b).)

o "[Northern Capital] will give [] [NCIAS] an accounting of all commissions due to [] [NCIAS] on the fifteenth (15th) day of each month for any and all business of the preceding month. . . . [Northern Capital] will also provide sales reports to [] [NCIAS] upon [NCIAS]'s request when [NCIAS] desires such report on [] [NCIAS]'s business." (*Id.* at Pg. ID 40, ¶ 2.)

o "[NCIAS] agrees to pay to [Northern Capital] 10% of gross revenue; such costs to [NCIAS] shall not be less than $40,000 in any fiscal year." (*Id.* at Pg. ID 40, ¶ 3.)

o "[NCIAS] and [Northern Capital] agree to review [the] business arrangement in 24 months.  If at that time either party decides that [the] contract and business arrangement does not meet their expectation then either party may remove themselves from [the] arrangement." (*Id.* at Pg. ID 40, ¶ 4.)

Plaintiffs allege that, from 2008 through September 30, 2019, NCIAS performed its obligations under the Agency Agreement and Addendum, producing millions of dollars of premiums and, thereby, millions of dollars in commissions.

4

(*Id*. at Pg. ID 17.)  Plaintiffs further allege that, during the same time period,

Northern Capital:

- Failed to pay the agreed upon expenses, with NCIAS paying "all of their own business expenses associated with the business it produced under the Agency Agreement and Addendum" (including "employee salaries, taxes, insurance, commissions, utilities, rent, office expenses, information technology, licenses, entertainment and other similar expenses").  (*Id*. at Pg. ID 17-18.)

- Shared NCIAS's "confidential and propriety information . . . with third parties."  (*Id*. at Pg. ID 25.)

- "[F]ailed to provide NCIAS with production reports, commission statements, sales reports accounting and other financial support relating to commissions paid to Northern Capital for NCIAS's business"; "[F]ailed to provide NCIAS with copies of Northern Capital's contingency agreements, and evidence of contingency calculations and payments made under those agreements by the applicable insurance companies."  (*Id*. at Pg. ID 17.)

- "[M]isrepresented to NCIAS the amount of commissions and contingency payments that were paid to Northern Capital by the relevant insurance companies (such as, Fremont Insurance Company) for business produced by NCIAS"; "[F]ailed to pay all and misrepresented the amount of commissions and contingency commissions due NCIAS under the Agency Agreement and Addendum."  (*Id*.)

## **Choice Insurance Allegedly Acquires Northern Capital**

Plaintiffs allege that, on or about February 1, 2019, Choice Insurance

acquired the stock or business of Northern Capital.  (*Id*. at Pg. ID 27.)  According

to a February 7, 2019 press release:[2]

> Choice Bank [] entered into an agreement to acquire
> Northern Capital Insurance Group . . . .  The acquisition
> was final as of Friday, February 1, 2019.  Northern Capital
> Insurance will continue to operate under the same name,
> as a division of Choice Insurance, for an undisclosed
> period of time.

(Ex. 2, ECF No. 14-3 at Pg. ID 474.)

Plaintiffs further allege that Mann advised them of this transaction for the

first time on or around the day of acquisition.  (ECF No. 1-1 at Pg. ID 27.)

---

[2] This press release was attached as an exhibit to Plaintiffs' response to
Defendants' Motion to Dismiss.  In their reply brief, Defendants contend that
Plaintiffs "improperly submitted" the document.  (ECF No. 16 at Pg. ID 562.)  In
their Complaint, Plaintiffs alleged that, on or about February 1, 2019, "Choice
Insurance acquired the stock or business of Northern Capital" and Choice
Insurance is doing business as Northern Capital.  (ECF No. 1-1 at Pg. ID 13, 27.)
The Court will consider the press release in deciding this 12(b)(6) motion because
it "simply fill[s] in the contours and details of the plaintiff's complaint, and add[s]
nothing new."  *Yeary v. Goodwill Indus.-Knoxville, Inc*., 107 F.3d 443, 445 (6th
Cir. 1997); *see also Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("Yet,
if extrinsic materials merely 'fill in the contours and details' of a complaint, they
add nothing new and may be considered without converting the motion to one for
summary judgment.").  In addition, Defendants had ample opportunity to respond
to content of the press release in their reply brief.  Thus, "[i]t cannot be said that
they suffered any prejudicial surprise."  *Yeary*, 107 F.3d at 445.

Following the closing of the transaction, Defendants notified regulatory agencies, errors and omissions insurance carriers, and other insurance companies that NCIAS was or had been acquired by Defendants as a part of the transaction. (*Id.*)

Plaintiffs allege that NCIAS was never acquired by and never served as a subsidiary of either Northern Capital or Choice Insurance. (*Id.*) Rather, as a result of the February 1 transaction, Choice Insurance not only acquired Northern Capital but also "an assignment of the Agency Agreement and Addendum." (*Id.* at Pg. ID 30.)

## Peterson and Northern Capital Enter into An Independent Contractor Agreement

Also on February 1, 2019, Peterson and Northern Capital entered into an Independent Contractor Agreement ("IC Agreement"). (*See id.* at Pg. ID 42, 44.) Plaintiffs allege that, in order to induce Peterson to sign the IC Agreement, Mann represented that the new agreement "was necessary to show bank ownership." (*Id.* at Pg. ID 18.) The IC Agreement included the following provisions:

- "[Northern Capital] [will] [] pay [Peterson] and any employee or independent contractor [Peterson] hires a commission split excluding profit sharing as agreed to by both parties." (*Id.* at Pg. ID 42.) "Peterson is entitled to receive her pro-rata share of profit sharing checks from the Accident Fund and Michigan Miller's. . . . If [] Peterson becomes 50% of the production for any other carrier she will be entitled to receive her pro-rated percentage of profit sharing from any such carrier." (*Id.* at Pg. ID 44.)

7

- "[Peterson] will own all accounts generated by [Peterson], it's employees or independent contractors. All records associated with the above commissions or accounts will be owned by [Peterson]." (*Id*. at Pg. ID 42.)

- "[Northern Capital] will maintain an income statement solely for the purpose of determining profit generated from [Peterson's] operations." (*Id*.)

Plaintiffs allege that Choice Insurance has not provided Peterson with an income statement for her business, nor paid commissions and profit sharing due and owed to Peterson.[3]  (*Id*. at Pg. ID 18.)  In addition, upon Plaintiffs' information and belief, Choice Insurance has shared Peterson's confidential and proprietary information with third parties.  (*Id*. at Pg. ID 19.)

## APPLICABLE STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint.  *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996).  Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is

---

[3] The Court highlights that, despite the fact that Peterson and *Northern Capital* were parties to the IC Agreement, Plaintiffs' lodge their allegations regarding the IC Agreement as to *Choice Insurance*.  The discussion *infra* as to Count VI (Breach of Contract as to Choice Insurance) may clarify any confusion fostered by the manner in which Plaintiffs frame these allegations.

8

entitled to relief." To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action . . .." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not "suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

As the Supreme Court provided in *Iqbal* and *Twombly*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.

In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). This presumption is not applicable to legal conclusions, however. *Iqbal*, 556 U.S. at 668. Therefore, "[t]hreadbare recitals of the elements

9

of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citing *Twombly*, 550 U.S. at 555).

Ordinarily, the court may not consider matters outside the pleadings when deciding a Rule 12(b)(6) motion to dismiss. *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 88 (6th Cir. 1997) (citing *Hammond v. Baldwin*, 866 F.2d 172, 175 (6th Cir. 1989)). A court that considers such matters must first convert the motion to dismiss to one for summary judgment. *See* Fed. R. Civ. P 12(d). However, "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to [the] defendant's motion to dismiss, so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). The court may take judicial notice only "of facts which are not subject to reasonable dispute." *Jones v. Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) (citation omitted).

## APPLICABLE LAW AND ANALYSIS

### Breach of Contract as to Choice Insurance (Count VI)

To establish a claim for breach of contract under Michigan law, a plaintiff must show that "(1) that there was a contract, (2) that the other party breached the

contract and, (3) that the party asserting breach of contract suffered damages as a result of the breach." *AFT Michigan v. Michigan*, 846 N.W.2d 583, 590 (Mich. Ct. App. 2014), *aff'd sub nom. AFT Michigan v. State of Michigan*, 866 N.W.2d 782 (Mich. 2015) (citation omitted).

Plaintiffs allege that Choice Insurance breached the IC Agreement by (i) "sharing and disclosing Plaintiffs' confidential and proprietary information with third-parties"; (ii) "representing to third parties that Plaintiffs were a part of a transaction between Northern Capital and Choice Insurance"; (iii) failing "to provide[] Peterson with an income statement for her business"; and (iv) failing to "pa[y] commissions and profit sharing due and owing [to] Peterson under the IC[] Agreement." (ECF No. 1-1 at Pg. ID 18, 26.) Defendants argue that this claim fails because (i) Peterson and Northern Capital—not Choice Insurance—are parties to the IC Agreement and (ii) even if Choice Insurance was party to the agreement, Choice Insurance did not breach any of its provisions. (ECF No. 3 at Pg. ID 66-69.) The Court takes each of Defendants' arguments in turn.

First, a review of the IC Agreement shows that "Peterson . . . and Northern Capital Insurance Group . . . agree[d] to enter into a brokerage agreement." (ECF No. 1-1 at Pg. ID 42.) But Plaintiffs' allege that, on or about February 1, 2019,

11

"Choice Insurance acquired the stock or business of Northern Capital."  (*Id.* at Pg. ID 27.)

In *Turner v. Bituminous Casualty Company*, Michigan courts' seminal decision on the issue of successor liability, the Supreme Court of Michigan stated that "a traditional merger [is] accompanied by exchange of stock."  244 N.W.2d 873, 878 (Mich. 1976).  The *Turner* court further stated that "[i]t is the law in Michigan that if two corporations merge, the obligations of each become the obligations of the resulting corporation."  *Id*. at 879 (citation omitted).  "In such a situation, therefore, the injured person could sue the new corporation."  *Id*.

In this case, according to the February 7, 2019 press release, "Choice Bank [] entered into an agreement to acquire Northern Capital Insurance Group . . . [on] [] February 1, 2019."  (ECF No. 14-3 at Pg. ID 474).  And following the acquisition, "Northern Capital Insurance [would] continue to operate under the same name, as a division of Choice Insurance, for an undisclosed period of time. (*Id*.)  Defendants contend that "Choice [Insurance] was not using the assumed name Northern Capital Insurance Group when Peterson and Northern Capital [] signed the IC Agreement."  (ECF No. 3 at Pg. ID 66-67.)  Even if true, this assertion is not inconsistent with Plaintiff's allegation that Choice Insurance acquired Northern Capital's stock and the suggestion in the press release that

12

Northern Capital retained its name as a division of Choice Insurance.  Accepting Plaintiffs' allegations as true, Plaintiffs have shown sufficient facts to suggest that Choice Insurance assumed the liabilities of Northern Capital as a result of the February 1 transaction.  If this is true, Plaintiffs can sue Choice Insurance for the alleged breach of the IC Agreement.

Second, Defendants contend that "there is no provision in the IC Agreement that discusses . . . [P]laintiffs' confidential information or that prohibits Choice [Insurance] [] from disclosing information to third parties."  (*Id*. at Pg. ID 68.)  The IC Agreement states that "[a]ll records associated with the [] commissions or accounts will be owned by [Peterson]" and, if the agreement is terminated, "[Northern Capital] will . . . transfer all records."  (ECF No. 1-1 at Pg. ID 42.)  Plaintiffs argue that "whether Defendants' disclosure of account information and records owned exclusively by Plaintiffs amounts to a breach of the IC Agreement is solely a question to be addressed by a jury."  (ECF No. 14 at Pg. ID 419.)

It is unclear whether the language regarding Peterson's ownership of records and information constitutes a nondisclosure provision.  "In reviewing a Rule 12(b)(6) motion to dismiss, the Court . . . must resolve all ambiguities in the contract in Plaintiffs' favor."  *Ajuba Intern., L.L.C. v. Saharia*, 871 F. Supp. 2d 671, 689 (E.D. Mich. 2012) (internal quotation marks and citation omitted).  "A

court should not choose between reasonable interpretations of ambiguous contract provisions when considering a motion to dismiss," meaning that the "construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim." *Id.* (internal quotation marks and citations omitted); *see also Ram Int'l, Inc. v. ADT Sec. Servs.,* Inc., 555 F. App'x 493, 503 (6th Cir. 2014) (citing *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453-54 (Mich. 2003)) (affirming denial of 12(b)(6) motion to dismiss breach of contract claim after finding contractual provision ambiguous).

Defendants further contend, however, that "[t]he IC Agreement is [] silent as to [] restrictions on the types of representations the parties . . . can make about one another." (ECF No. 3 at Pg. ID 68.) Having carefully reviewed the agreement, the Court agrees with Defendants. *Northampton Rest. Grp., Inc. v. FirstMerit Bank, N.A.*, 492 Fed. Appx. 518, 521 (6th Cir. 2012) (affirming dismissal of breach of contract claim on the grounds that plaintiff "did not include the language of any specific contractual provisions that had been breached"). Moreover, because Plaintiffs did not refute this argument in their response brief, (*see* ECF No. 14 at Pg. ID 419-20), "the[] argument[] [is] deemed conceded and waived," *Boone v. Heyns*, No. 12-14098, 2017 WL 3977524, at *5 (E.D. Mich. Sept. 11, 2017). *See also McPherson v. Kelsey*, 125 F. 3d 989, 995 (6th Cir. 1997)

14

("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Defendants also argue that "[t]here is no provision in the IC Agreement that requires an income statement or an accounting to be provided to Peterson." (ECF No. 3 at Pg. ID 69.) The IC Agreement states that "[Northern Capital] will *maintain* an income statement solely for the purpose of determining profit generated from [Peterson's] operations." (ECF No. 1-1 at Pg. ID 42 (emphasis added).) Considering this clear contractual language, to the extent that Plaintiffs allege that Defendants failed "to *provide*[] Peterson with an income statement for her business," (*Id.* at Pg. ID 18 (emphasis added)), Plaintiffs' claim fails.

Defendants further argue that "[t]he only potential obligation in the IC Agreement is for the 'company' to 'pay' Peterson amounts due under the agreement" and "[b]ecause Choice [Insurance] is not a party to the IC Agreement," it has not breached any contract. (ECF No. 3 at Pg. ID 69.) As discussed above, Plaintiffs' allegations suggest that Choice Insurance may have taken on Northern Capital's liabilities. If this is true, Plaintiffs can hold Choice Insurance liable for Northern Capital's failure to "pa[y] commissions and profit sharing due and owing [to] Peterson under the IC[] Agreement." (ECF No. 1-1 at Pg. ID 18.) The Court,

15

thus, denies Defendants' Motion to Dismiss the breach of contract claim as to

Choice Insurance.

### **Fraudulent Misrepresentation as to Mann (Count II)**

To establish a claim for fraudulent misrepresentation, a plaintiff must show:

> (1) [t]hat defendant made a material misrepresentation; (2)
> that it was false; (3) that when he made it he knew it was
> false, or made it recklessly, without knowledge of its truth
> and as a positive assertion; (4) that he made it with the
> intention that it should be acted upon by plaintiff; (5) that
> plaintiff acted in reliance upon it; and (6) that he thereby
> suffered injury.

*Lawrence M. Clarke, Inc. v. Richco Constr., Inc.*, 803 N.W.2d 151, 162 (Mich.

2011) (citation omitted).

Plaintiffs allege that Mann made several misrepresentations:

1. Mann "*would* . . . pa[y] NCIAS all of the commissions and
   contingency commissions due NCIAS under the Agency
   Agreement and Addendum."  (ECF No. 1-1 at Pg. ID 20
   (emphasis added).)

2. Mann "would provide NCIAS with copies of all supporting
   documentation for all commissions and contingency
   commissions, bonus, or profit sharing arrangements of
   Northern Capital, while the Agency Agreement and
   Addendum were in effect." (*Id.*)

3. NCIAS "would be entitled to 90% of the full commission
   paid to it by Northern Capital's insurance carriers for
   business produced by NCIAS." (*Id.*)

4.  Mann "would provide an accounting of all commissions due to NCIAS by the fifteenth day of each month."  (*Id.*)

5.  Mann "*ha[d]* paid NCIAS all of the commissions and contingency commissions due NCIAS under the Agency Agreement and Addendum."  (*Id.* (emphasis added).)

6.  Mann misrepresented "the amount of gross commissions and contingency commissions earned from 2008 through 2019 and the commissions paid to Northern Capital by its insurance companies [(such as, Fremont Insurance Company)] for business produced by NCIAS."  (*Id.* at Pg. ID 17, 20.)

The first four alleged misrepresentations constitute promises to take future action.  But "[a] party generally cannot state a claim for fraudulent misrepresentation based on another party's failure to do something it promised to do in the *future*."  *Blackward Props., LLC v. Bank of Am.*, 476 F. App'x 639, 643 (6th Cir. 2012) (emphasis in original); *see also Hi–Way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813, 816 (Mich. 1976) ("Future promises are contractual and do not constitute fraud."); *Mieske v. Harmony Elec. Co.*, 270 N.W. 216, 217 (Mich. 1936) (stating that a claim for fraudulent misrepresentation cannot be based on "mere broken promises, unfulfilled predictions, or erroneous conjectures as to future events").  Instead, "an action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an

existing fact." *Blackward*, 476 F. App'x at 643 (quoting *Hi-Way*, 247 N.W.2d at 816).

Even the exception to this rule—a plaintiff can bring a fraudulent misrepresentation action "if a promise is made in bad faith without the intention to perform it," *Derderian v. Genesys Health Care Sys.*, 689 N.W.2d 145, 156 (Mich. Ct. App. 2004) (citing *Hi-Way*, 247 N.W.2d at 816-17)—does not help Plaintiffs as to the first four alleged misrepresentations. *See Blackward*, 476 F. App'x at 643 (same). This is because Plaintiffs have not alleged that, when the aforementioned promises were made, Mann had no intention of keeping them. *See id.* (quoting *Derderian*, 689 N.W.2d at 156) (explaining that because "evidence of a broken promise is not evidence of fraud," in order for the exception to apply, a plaintiff must "show that, at the time the promise was made, [the defendant] did not intend to fulfill it").

Turning to the latter two alleged misrepresentations, the Court notes that these statements properly concerned past or existing facts. To support their argument for dismissal as to this claim though, Defendants proffer three arguments, each of which the Court takes in turn. First, it is true that the economic loss doctrine—which prohibits a plaintiff from bringing tort claims that are factually indistinguishable from breach of contract claims—applies to fraud

18

claims.  However, the economic loss doctrine only applies to transactions involving the sale of goods—not services, as is the case here.  *See George v. McGee*, No. 347636, 2020 WL 862814, at *3 (Mich. Ct. App. Feb. 20, 2020) (explaining that when a "case does not involve the commercial sale of goods[,] . . . . the economic loss doctrine [does not] apply").[4]

Second, Defendants contend that Plaintiffs fail to satisfy the pleading requirements outlined in Federal Rule of Civil Procedure 9(b).  Rule 9(b) requires a plaintiff bringing a fraud claim to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  Construing the Complaint liberally, the Court finds that the last two allegations satisfy this requirement because they could be interpreted to mean that Mann made new fraudulent misrepresentations each

---

[4] The *George* court also noted, however, that where "the economic loss doctrine does not apply, *Rinaldo*'s principles about raising tort claims for contractual breaches may."  *George*, 2020 WL 862814, at *3 (citing *Rinaldo's Constr. Corp. v. Mich. Bell Tel. Co.*, 559 N.W.2d 647 (Mich. 1997)) ("This concept applies independent of the economic loss doctrine.").  According to the Michigan Supreme Court, "'a tort action stemming from misfeasance of a contractual obligation' may be maintained when there is 'the violation of a legal duty separate and distinct from the contractual obligation.'"  *Id.* (quoting *Fultz v. Union-Commerce Assoc.*, 683 N.W.2d 587, 593 (Mich. 2004)).  Stated another way, "if a relation exists which would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise not."  *Hart v. Ludwig*, 79 N.W.2d 895, 898 (Mich. 1956) (internal quotation marks and citation omitted).  Defendants did not address this argument in their Motion to Dismiss as it relates to Plaintiffs' fraudulent misrepresentation claim.  Thus, the Court need not address it.

and every year between 2008 and 2019.  (*See* ECF No. 14 at Pg. ID 429.)  Indeed,

these allegations are plead in a manner that "places [] [D]efendant[s] on 'sufficient

notice of the misrepresentation'" such that Defendants can answer the fraud claim

"in an informed way."  *Coffey v. Foamex L.P.*, 2 F.3d 157, 162 (6th Cir. 1993)

(citation omitted).  Third, the Court agrees with Defendants to some extent

regarding whether the fraud claim is barred by the applicable statute of limitations.

Under Michigan law, the statute of limitations for fraud claims is six years.  Mich.

Comp. Laws § 600.5813.  Accordingly, as it concerns the last two alleged

misrepresentations, Defendants are liable for only those statements made in the six

years preceding the filing of this suit.

Plaintiffs contend that the statute of limitation should be tolled.  (ECF No.

14 at Pg. ID 428-29.)  Under Michigan law, "[i]f a person who is or may be liable

for any claim fraudulently conceals the existence of the claim . . ., the action may

be commenced at any time within 2 years after the person who is entitled to bring

the action discovers, or should have discovered, the existence of the claim."  Mich.

Comp. Laws § 600.5855.  To demonstrate fraudulent concealment, a plaintiff must

allege:  "(1) wrongful concealment of their actions by the defendants; (2) failure of

the plaintiff to discover the operative facts that are the basis of his cause of action

within the limitations period; and (3) *plaintiff's due diligence until discovery of the*

*facts*." *Evans v. Pearson Enters., Inc.*, 434 F.3d 839, 851 (6th Cir. 2006) (emphasis added) (citation omitted).  It is sufficient to note that Plaintiffs have altogether failed to plead their own due diligence.  *See Evans*, 434 F.3d at 851 (affirming the district court's dismissal of plaintiff's claim where plaintiff "failed to plead that she exercised any due diligence in discovering the facts that she alleged").

As the Sixth Circuit has explained, "an injured party has a positive duty to use diligence in discovering his cause of action within the limitations period" and "the means of knowledge are the same thing in effect as knowledge itself." *Dayco Corp. v. Goodyear Tire & Rubber Co*., 523 F.2d 389, 394 (6th Cir. 1975) (quoting *Wood v. Carpenter*, 101 U.S. 135, 143 (1879)).  It is notable that Plaintiffs did not respond to Defendants' argument that they "failed to take action [for] nearly twelve years," even though—since 2008—Plaintiffs believed that, based on the agreement, they were entitled to receive supporting documents and an accounting. (ECF Nos. 3 at Pg. ID 78; 1-1 at Pg. ID 40, ¶¶ 1-4.)  Accordingly, Defendants contend, "[P]laintiffs were aware of their potential cause of action" during their lengthy period of inaction.  (ECF No. 3 at Pg. ID 78.)  Based on the allegations in the current Complaint, the Court agrees that Plaintiffs' failure to "assert[] what

21

steps were taken is insufficient" to show the fraudulent concealment required to toll the statute of limitations.[5]  *See Dayco*, 523 F.2d at 394 (same).

Plaintiffs further contend that the "continuing wrong" doctrine applies. (ECF No. 14 at Pg. ID 429.)  Specifically, Plaintiffs point to *Horvath v. Delida*, 540 N.W.2d 760, 763 (Mich. Ct. App. 1995) to support their contention that Mann made "new" fraudulent misrepresentations "***each and every year*** between 2008 and 2019" and, each time he made such representations, "an entirely new cause of action accrued."  (ECF No. 14 at Pg. ID 429 (emphasis in original).)

Though it is well-established under Michigan law that the "continuing wrong" doctrine does not apply in the context of breach of contract claims, *see Blazer Foods, Inc. v. Rest. Props., Inc.*, 673 N.W.2d 805, 812 (Mich. Ct. App.

---

[5] The Court further notes that Plaintiffs allege that Mann "was aware of his duty to provide supporting documentation and an accounting of commissions and contingency commissions due [to] NCIAS."  (ECF No. 1-1 at Pg. ID 31.)  According to Plaintiffs, "[h]ad Mann provided the information he was obligated to provide, NCIAS would have discovered that Northern Capital and Mann owned substantial commissions and contingency commissions to NCIAS."  (*Id*. at Pg. ID 32.)  Notably, this allegation is devoid of any indication that *Plaintiffs* took indisputably available steps—i.e., requesting the supporting documentation or an accounting—to discover this alleged cause of action during the limitations period.  Moreover, Plaintiffs do not allege that they exercised their contractual right to "remove themselves from th[e] [business] arrangement" at the time of "review," which the Agency Agreement states would occur every 24 months.  (*Id*. at Pg. ID 40, ¶ 4.)  This inaction in the midst of Defendants' alleged failure to satisfy their contractual obligations further demonstrates Plaintiffs' lack of due diligence.

2003), the same cannot be said regarding the doctrine's application to fraudulent

misrepresentations claims.  As explained in *Currithers v. FedEx Ground Package*

*Sys., Inc.*, "[a]pplication of the doctrine to [p]laintiffs' fraudulent misrepresentation

claim is less clear, because claims alleging fraudulent misrepresentation need not

necessarily sound in tort."  No. 04-10055, 2012 WL 458466, at *10 (E.D. Mich.

Feb. 13, 2012) (citing *Wilcoxon v. Wayne County Neighborhood Legal Servs.*, 652

N.W.2d 851, 853 n.4 (Mich. Ct. App. 2002)).  "Depending on the circumstances,

they could be understood as a waiver of a tort action in favor of seeking restitution

under a theory of quasi-contract."  *Id*. (citing *Wilcoxon*, 652 N.W.2d at 853 n.4).

In *Currithers*, the court noted that "Plaintiffs do not allege that the

misrepresentations sounded in tort, but contend that the misrepresentations were

made to induce Plaintiffs' reliance, such that they would enter into the Operating

Agreement and believe they would be treated as independent contractors."  (*Id*.)

This case is no different—Plaintiffs alleged that "NCIAS . . . reasonably rel[ied] on

the misrepresentations when it produced and continued to produce business under

the Agency Agreement and Addendum" and Mann's alleged misrepresentations

"resulted in loss commissions and contingency commissions in excess of

$1,000,000."  (ECF No. 1-1 at Pg. 21.)  Here, just as in *Currithers*, "[t]he

continuing wrongs doctrine may not be applied to Plaintiffs' fraudulent

23

misrepresentation claims because the claims sound in contract and the continuing

wrong doctrine no longer applies to contract claims under Michigan law."

*Currithers*, 2012 WL 458466, at *10.

Accordingly, the Court denies Defendants' Motion to Dismiss Plaintiffs'

fraudulent misrepresentation claim as to Mann, though the claim is considerably

narrowed by the aforementioned analysis.

### Innocent Misrepresentation as to Mann (Count III)

To prevail on a claim of innocent misrepresentation under Michigan law, a

plaintiff must show that (i) a false and material misrepresentation was made; (ii)

the plaintiff detrimentally relied upon the misrepresentation; and (iii) the injury

inures to the benefit of the person making the representation.  *M & D, Inc. v.

McConkey*, 585 N.W.2d 33, 37 (Mich. Ct. App. 1998) (citation omitted).

To support this claim, Plaintiff points to largely the same representations

discussed as to Count II (Fraudulent Misrepresentation).  (*See* ECF No. 1-1 at Pg.

ID 20-21.)  Defendants argue that, because "[P]laintiffs have not alleged a benefit

inuring to Mann in his individual capacity," the final element of the claim is not

satisfied.  (ECF No. 3 at Pg. ID 80.)  In response, Plaintiffs contend that Mann can

be "held personally liable for any tortious conduct he commits" and they "have []

24

alleged that Northern Capital benefited from the false representations of its President." (ECF No. 14 at Pg. ID 431 (citing ECF No. 1-1 at Pg. ID 22, ¶ 66).)

Even if both of these arguments prove true, it does not move Plaintiffs closer to satisfying their obligation to show an injury inuring to the benefit of Mann, the person making the representation. *See M & D, Inc.*, 585 N.W.2d at 37 (citation omitted). Accordingly, the Court dismisses Plaintiffs' innocent misrepresentation claim as to Mann.

## **Silent Fraud as to Mann (Count IX)**

"Silent fraud is essentially the same [as fraudulent misrepresentation] except that it is based on a defendant suppressing a material fact that he or she was legally obligated to disclose, rather than making an affirmative misrepresentation." *Tocco v. Richman Greer Prof'l Ass'n*, 553 F. App'x 473, 476 (6th Cir. 2013) (alternation in original) (quoting *Alfieri v. Bertorelli*, 813 N.W.2d 772, 775 (Mich. Ct. App. 2012)). In order to establish a claim for silent fraud, a plaintiff must allege facts showing: (i) "a pre-existing legal or equitable duty to disclose"; (ii) "suppression of information with the intent to defraud"; (iii) "reasonable reliance upon

defendant's performance of the duty"; and (iv) "damages caused by the suppression of the information."  *Id*. at 476-77 (citations omitted).

Plaintiffs allege that Mann "was aware of his duty to provide supporting documentation and an accounting of commissions and contingency commissions due [to] NCIAS."  (ECF No. 1-1 at Pg. ID 31.)  This claim fails at the outset because Plaintiffs fail to identify a duty separate and apart from Defendants' contractual duty.  *Chaudhary v. JDS Pump N Go, LLC*, No. 347000, 2020 WL 2501660, at *7 (Mich. Ct. App. May 14, 2020) (affirming summary disposition where "allegations arose from the parties' contractual relationship, not from a separate duty"); *see also Fultz*, 683 N.W.2d at 591 ("[A] tort action will not lie when based solely on the nonperformance of a contractual duty."); *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc*., 532 N.W.2d 541, 545 (Mich. Ct. App. 1995) ("[T]he misrepresentations relate to the breaching party's performance of the contract and do not give rise to an independent cause of action in tort.").

Accordingly, the Court dismisses Plaintiff's silent fraud claim as to Mann.

### **Statutory Conversion as to Choice Insurance (Count IV)**

"In order to prevail on a claim for statutory conversion, a plaintiff must satisfy the elements of a common law conversion claim, as well as demonstrate that the defendant had 'actual knowledge' of the converting activity."  *Nedschroef*

*Detroit Corp. v. Bemas Enters. LLC*, 106 F. Supp. 3d 874, 886 (E.D. Mich. 2015),

*aff'd*, 646 F. App'x 418 (6th Cir. 2016) (citation omitted); *see also Olympic Forest*

*Prod., Ltd. v. Cooper*, 148 F. App'x 260, 265 (6th Cir. 2005) ("In Michigan, a

statutory claim of conversion consists of *knowingly* buying, receiving, or aiding in

the concealment of stolen, embezzled, or converted property.").

A common law conversion claim requires allegations of "any distinct act of

domain wrongfully exerted over another's personal property in denial of or

inconsistent with the rights therein." *Foremost Ins. Co. v. Allstate Ins. Co.*, 486

N.W.2d 600, 606 (Mich. 1992). "Conversion may occur when a party properly in

possession of property uses it in an improper way, for an improper purpose, or by

delivering it without authorization to a third party." *Dep't of Agric. v. Appletree*

*Mktg. LLC*, 779 N.W.2d 237, 244-45 (Mich. 2010). To prevail on an action for

conversion of money (as opposed to property), "the defendant must have an

obligation to *return the specific money* entrusted to his care." *Sudden Serv., Inc. v.*

*Brockman Forklifts, Inc*., 647 F. Supp. 2d 811, 815 (E.D. Mich. 2008) (emphasis

added) (citing *Check Reporting Servs., Inc. v. Mich. Nat'l Bank–Lansing*, 478

N.W.2d 893, 900 (1991)); *see also In re B & P Baird Holdings, Inc*., No. AP 11-

80397, 2015 WL 6152959, at *8 (Bankr. W.D. Mich. Oct. 15, 2015), *aff'd sub*

*nom. Hagan v. Baird*, 288 F. Supp. 3d 803 (W.D. Mich. 2018), *aff'd sub nom. In re*

27

*B & P Baird Holdings, Inc.*, 759 F. App'x 468 (6th Cir. 2019) ("[S]uccess on a conversion count involving money is not assured simply by tracing funds. The plaintiff must establish 'an obligation to keep intact or deliver the specific money in question.'").

Plaintiffs allege that, "[r]ather than paying the commissions due and owing to NCIAS and Peterson, . . . Choice Insurance refused to pay NCIAS and Peterson's commissions and contingency commissions, and instead, have converted such funds to their own uses." (ECF No. 1-1 at Pg. ID 23.) The Court finds that, for two reasons, the facts here do not support a claim of conversion.

First, Plaintiffs did not entrust or pay "specific money" to Defendants; Plaintiffs did not hand over specific funds, much less specific funds Defendants were obligated to later "return." *See Warren Tool Co. v. Stephenson*, 161 N.W.2d 133, 148 (Mich. Ct. App. 1968) (suggesting no conversion claim where "plaintiffs . . . agree to allow [defendants] to collect such moneys and account therefor at a later time"). And each of the cases Plaintiffs cite in support of their argument to the contrary are readily distinguishable.

In *Hanover Exch. v. Metro Equity Grp., LLC*, No. 2:08-cv-14897, 2009 WL 2143866, at *2 (E.D. Mich. July 14, 2009), the court found that the plaintiff's claim fell within the "specific money" requirement because the "defendants used

28

the money in [a] escrow account for unauthorized purposes when in fact they were duty bound to return the funds."  Here, Plaintiffs have not alleged that they removed from their coffers specific funds that they then placed in an account to be managed by Defendants.

In *Citizens Ins. Co. v. Delcamp Truck Ctr., Inc.*, 444 N.W.2d 210, 212 (Mich. Ct. App. 1989), the plaintiff wrote a check for a specific amount and sent it to the defendant.  The court found that the defendant "converted [the plaintiff's] personal property when it cashed [the plaintiff's] check and retained the full amount of that check when it was entitled to only a portion." *Id*. at 213.  Here, unlike in *Delcamp*, Plaintiffs did not give Defendants specific funds, a portion of which Defendants were obligated to pass on to another party or return to Plaintiffs upon their request.

In *In re B & P Baird Holdings, Inc.*, 591 F. App'x 434, 439-440 (6th Cir. 2015), the court found that the defendant, who controlled the funds generated from the sale of a debtor's assets, impermissibly appropriated the funds for personal use. The Sixth Circuit affirmed the district court's finding of conversion in part because, "[u]nder applicable Michigan law, '[t]he assets of a corporation are a trust found in the hand of the board of directors.'" *Id.* at 440 (citation omitted).  In other

words, there unlike here, the debtor removed specific assets from his possession and placed them in an account controlled in part by the defendant.

Ultimately, the crux of Plaintiffs' argument is that the parties engaged in the sale of insurance services according to an express contract and Defendants breached the contractual provision requiring them to "pay[] the commissions due and owing to NCIAS and Peterson." (ECF No. 1-1 at Pg. ID 23.) "Because Plaintiff's cause of action arises from the breach of the contract (and not the appropriation of specific funds in violation of a separate legal duty), Plaintiff's conversion claim fails." *Sudden Serv.*, 647 F. Supp. at 816.

The Court therefore dismisses Plaintiffs' statutory conversion claim as to Choice Insurance.

### Accounting as to Choice Insurance (Count V)

An accounting is "an extraordinary remedy, and like other equitable remedies, is available only when legal remedies are inadequate." *Bradshaw v. Thompson*, 454 F.2d 75, 79 (6th. Cir. 1972). "The burden of proof is on plaintiff to show the inadequacy of the legal remedy," and "Michigan courts have long held that an accounting in equity is unnecessary where discovery is sufficient to determine the amounts at issue." *Wilson v. Cont'l Dev. Co.*, 112 F. Supp. 2d 648, 663 (W.D. Mich. 1999) (citations omitted). Furthermore, "[t]he law is clear that an

30

accounting may not be had where the action is for a specific sum due under a contract." *Barkho v. Homecomings Fin., LLC*, 657 F. Supp. 2d 857, 865 (E.D. Mich. 2009) (internal quotation marks and citation omitted).

Plaintiffs allege that Northern Capital and Choice Insurance have never provided (i) "an accounting of all commissions and contingency commissions due to NCIAS and Peterson"; (ii) "a copy of all contingency, bonus, or profit sharing arrangements [they] had with applicable markets"; and (iii) "an income statement to Peterson relating to the business produce[d] by Peterson under the IC[] Agreement." (ECF No. 1-1 at Pg. ID 24.) According to Plaintiffs, "NCIAS and Peterson cannot, even with liberal discovery, reasonably be expected to ascertain the amount due." (*Id*. at Pg. ID 25.) Accordingly, Plaintiffs seek "a complete accounting of all of its business produced through Northern Capital and Choice Insurance, . . . so that it can determine the exact amount of commissions and contingency commissions owed them." (*Id*.)

Here, Plaintiffs allege that they are owed an amount "*in excess of* $1,000,000." (*Id*. at Pg. ID 22 (emphasis added).) This does not constitute "a specific sum due under a contract." But, at this stage in the litigation and based on the allegations in the Complaint, the Court agrees with Defendants' contention that "[t]here is [] no reasonable basis for assuming that typical discovery procedures

would be inadequate for plaintiffs to determine the amounts they claim to be

owed."  (ECF No. 3 at Pg. ID 73.)  In their response brief, Plaintiffs appear to

concede that this claim is premature, stating that "an accounting *may* be necessary

should Defendants refuse to provide the accurate commission reports and

underlying data during discovery."  (ECF No. 14 at Pg. ID 424 (emphasis added).)

This assertion very well may be true if Plaintiffs question the accuracy of any

reports or data Defendants provide during discovery.  Until then however, the

Court finds that the rules governing civil procedure are fully adequate to provide

any relief sought by Plaintiffs.

Accordingly, the Court dismisses Plaintiffs' claim for an accounting as to

Choice Insurance.

### Tortious Interference with a Contract or Business Relations as to Choice Insurance & Mann (Count VII)

"In Michigan, tortious interference with a contract or contractual relations is

a cause of action distinct from tortious interference with a business relationship or

expectancy."  *Asphalt Sols. Plus, LLC v. Associated Const. of Battle Creek, Inc*.,

No. 301136, 2011 WL 6187043, at *3 (Mich. Ct. App. Dec. 13, 2011) (citation

omitted); *see also Fidelity Nat. Title Ins. Co. v. Title First Agency, Inc.*, 2008 WL

4371838, at *7 (E.D. Mich. Sept. 22, 2008) ("Tortious interference with contract

exists when a third party to a contract, knowing of the contract, intentionally and

wrongfully induces a breach of the contract which results in damage to a non-

breaching party.").

"The elements of tortious interference with a contract are (1) the existence of

a contract, (2) a breach of the contract, and (3) an unjustified instigation of the

breach by the defendant." *Id.* (citation omitted).  Here, Plaintiffs did not identify

any contract between them and parties other than Defendants—much less one

whose breach Defendants instigated.

A claim for tortious interference with a business relationship "requires proof

of (1) a valid business relationship or expectancy; (2) knowledge of that

relationship or expectancy on the part of the defendant; (3) an intentional

interference by the defendant inducing or causing a breach or termination of that

relationship or expectancy; and (4) resulting damage to the plaintiff." *Warrior

Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, 623 F.3d 281, 286 (6th Cir. 2010)

(citing *Badiee v. Brighton Area Schs.*, 695 N.W.2d 521, 538 (Mich. Ct. App.

2005)).  In order to establish this claim, Plaintiff must allege that Defendants

engaged in "a lawful act with malice and unjustified in law for the purpose of

invading" Plaintiffs' business relationship with another.  *Derderian*, 689 N.W.2d at

157-58 (citation omitted).  "To establish that a lawful act was done with malice and

without justification, the plaintiff must demonstrate, with specificity, affirmative

33

acts by the defendant that corroborate the improper motive of the interference."

*Mino v. Clio. Sch. Dist.*, 661 N.W.2d 586, 597-98 (2003) (citation omitted).

To support this claim, Plaintiffs allege that:

1. "Defendants advising the insurance markets that Plaintiffs were part of the [February 1 transaction] was intended to disrupt and interfere with Plaintiffs' business relationships with their clients."  (ECF No. 1-1 at Pg. ID 28.)

2. "Defendants have shared Plaintiffs['] records and information with third parties as a part of their intent to interfere with . . . the business relationship between Plaintiffs and their clients and the business relationships between [P]laintiffs and their insurance markets. . . ." (*Id.*)

3. "Defendants advising insurance companies that Plaintiffs were part of the transaction was intended to mislead or confuse the insurance markets for the purpose of obtaining higher commissions and allow for sub-produced business where such insurance agreements disallowed such." (*Id.* at Pg. ID 27.)

4. "Defendants advising regulatory agencies that Plaintiffs were part of the transaction was intended to avoid state licensing regulations." (*Id.*)

The latter two allegations fail because they do not appear to even concern Plaintiffs' business relationship with parties other than Defendants.  In addition, the allegations do not support the conclusion that Defendants induced or caused a breach or termination of any such relationship.  And even if the alleged acts impacted such relationships or caused a breach or termination of them, these

34

allegations do not identify *which* business relationships experienced such interference.

According to Plaintiffs' first two allegations, which concern Plaintiffs business relationships with their clients, Defendants committed the "specific" and "affirmative acts" of sharing Plaintiffs' records and advising insurance markets that Plaintiffs were part of the February 1 transaction in order to "solicit" and "acquire" Plaintiffs' clients.  (*See id.* at Pg. ID 29 ("It will not be possible to determine the number of customers, potential customers, or acquisition targets solicited . . . by Defendants.").)   Because of Defendants' intentional acts, Plaintiffs contend, "business has been lost."  (*Id.* at Pg. ID 28.)  Indeed, the first two allegations are sufficient to survive Defendants' Motion to Dismiss.

### Receivership as to Choice Insurance (Count VIII)

Under Michigan law, courts have "broad jurisdiction to appoint a receiver in an appropriate case."  *Reed v. Reed*, 693 N.W.2d 825, 844 (Mich. Ct. App. 2005) (citations omitted).  "The purpose of appointing a receiver is to preserve property and to dispose of it under the order of the court."  *Id.* (citation omitted).  Notably however, "a receiver should only be appointed in extreme cases."  *Id.* (citation omitted).  Indeed, "the appointment of a receiver is a remedy of last resort and should not be used when another, less dramatic remedy exists."  *Woodward v.*

*Schwartz*, No. 343704, 2020 WL 1228657, at *2 (Mich. Ct. App. Mar. 12, 2020) (citation omitted). "When other approaches have failed to bring about compliance with a court's orders, whether through intransigence or incompetence, receivership may then be appropriate." *Petitpren v. Taylor Sch. Dist.*, 304 N.W.2d 553 (Mich. Ct. App. 1981).

Plaintiffs allege that following the alleged merger of Northern Capital and Choice Insurance and the creation of the IC Agreement on February 1, Northern Capital opened a bank account in the name of NCIAS in which monies were deposited and thereafter paid to NCIAS. (ECF No. 1-1 at Pg. ID 30.) Plaintiffs allege that Defendants opened the bank account without NCIAS's permission and have since diverted commissions due NCIAS to other accounts or affiliates of Defendants. (*Id.*) Plaintiffs further allege that, even though "[t]he stock and business of NCIAS was never sold or transferred to Defendants," "Defendants have made filings with regulatory authorities and insurance companies identifying NCIAS as a company or business that was acquired as a part of the [February 1] transaction." (*Id.*) Thus, according to Plaintiffs, "there is sufficient good cause warranting the appointment of a Receiver for Defendants in order to determine amounts due Plaintiffs and preserve the assets of the companies." (*Id.* at Pg. ID 31.)

36

The Court disagrees.  Plaintiffs point to no order with which Defendants have failed to comply.  Nor have Plaintiffs suggested that Defendants would be unable comply with any order or judgment the Court may issue in the future. Accordingly, the Court is not persuaded that a receiver is necessary at this time. The Court thus dismisses Plaintiffs' receivership claim as to Choice Insurance.

## CONCLUSION

For the reasons discussed above, the Court finds that Plaintiffs have failed to make out claims of innocent misrepresentation as to Mann (Count III), statutory conversion as to Choice Insurance (Count IV), accounting as to Choice Insurance (Count V), receivership as to Choice Insurance (Count VIII), and silent fraud as to Mann (Count IX).

Regarding Count II (Fraudulent Misrepresentation as to Mann), to the extent that Plaintiffs allege that Mann made new fraudulent misrepresentations each year between 2008 and 2019 regarding (i) whether he "ha[d] paid NCIAS all of the commissions and contingency commissions due"; (ii) "the amount of gross commissions and contingency commissions earned"; and (iii) "the commissions paid to Northern Capital by its insurance companies [(such as, Fremont Insurance Company)] for business produced by NCIAS," (ECF No. 1-1 at Pg. ID 17, 20),

Mann may be liable for only those statements made during the six years preceding the filing of this suit.

Regarding Count VI (Breach of Contract as to Choice Insurance), to the extent that Plaintiffs allege that Choice Insurance "shar[ed] and disclos[ed] Plaintiffs' confidential and proprietary information with third-parties" and failed to "pa[y] commissions and profit sharing due and owing" to Plaintiffs, (ECF No. 1-1 at Pg. ID 18, 23), the claim survives.

Regarding Count VII (Tortious Interference with a Contract or Business Relations as to Choice Insurance & Mann), to the extent that Plaintiffs allege that Choice Insurance and Mann (i) "advis[ed] the insurance markets that Plaintiffs were part of the [February 1 transaction] . . . to disrupt and interfere with Plaintiffs business relationships with their clients"; (ii) "shared Plaintiffs['] records and information with third parties as a part of their intent to interfere with . . . the business relationship between Plaintiffs and their clients and the business relationships between [P]laintiffs and their insurance markets. . . ."; and (iii) as a result, "business has been lost," the claim survives.  (*See* ECF No. 1-1 at Pg. ID 28.)

Accordingly,

38

**IT IS ORDERED** that Defendants' Motion to Dismiss (ECF No. 3) is **GRANTED** as to Counts III, IV, V, VIII, and IX.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss (ECF No. 3) is **DENIED** as to Counts II, VI, and VII.

**IT IS FURTHER ORDERED** that Defendant's Motion to Stay Discovery (ECF No. 28) is **DENIED** as moot.

**IT IS SO ORDERED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: January 12, 2021